UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| PATRICIA LaBRECQUE, as mother and next friend of T. N., )<br>)<br>Plaintiff )<br>)<br>v. )<br>)<br>SCHOOL ADMINISTRATIVE )<br>DISTRICT NO. 57, et al., )<br>)<br>Defendants ) | Docket No. 06-16-P-S |

RECOMMENDED DECISION ON PLAINTIFF'S MOTION FOR CONTEMPT, REMEDIAL ORDER, INJUNCTIVE RELIEF AND SANCTIONS

The plaintiff has filed a motion for contempt, remedial order, injunctive relief and sanctions in the wake of a hearing held by the board of defendant School Administrative District No. 57 ("MSAD 57") pursuant to the terms of an order issued by Judge Singal of this court on the plaintiff's motion for a temporary restraining order. *See* Motion for Temporary Restraining Order and Preliminary Injunction (Attachment 7 to Affidavit of Melissa M. Hewey, Esq. (Docket No. 2)). The instant motion purports to incorporate by reference "all the arguments in [the plaintiff's] original Memorandum of Law Supporting Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction" and various other pleadings. Plaintiffs' [sic] Motion for Contempt, Remedial Order, Injunctive Relief and Sanctions ("Motion") (Docket No. 32) at 1. The plaintiff also requests a new temporary restraining order ("TRO") "restraining and enjoining the Defendants SAD 57, School Board of Directors, and Green and Fisher ("School Defendants") and Defendants York, York County Sheriff's Department, Cote, Hayes, Hicks, Fecteau, Doe I and Doe 2 [sic] . . . from further violating Plaintiff's rights under

1

the U.S and Maine Constitutions, and state and federal law, and specifically issue an order pending resolution of Plaintiffs' Complaint that" the defendants do certain things. Motion at 2. I understand from remarks made by the plaintiff's counsel during a telephone conference I held with all counsel in the case on March 13, 2006 that the plaintiff seeks a new TRO at this time only against the School Defendants. My understanding is supported by the plaintiff's reply to the opposition filed by defendants Michael Hayes, Roger Hicks and Gary Fecteau (the "Police Defendants") (Docket No. 46) and defendants York County, the York County Sheriff's Department and Philip Cote (the "County Defendants") (Docket No. 47), to that portion of the instant motion that is the written brief requested by Judge Singal in connection with the plaintiff's pending request for a preliminary injunction. Plaintiff's Reply in Support of Motion for Preliminary Injunction and Motion for Contempt (Re: Police and County Defendants) (Docket No. 49) at 1-2. I recommend that the new request for a TRO be denied.

The plaintiff seeks a finding of contempt and an award of sanctions only against the School Defendants.[1] *Id*. Because the preliminary injunction requested by the plaintiff at the outset of this case has merely been incorporated by reference into the instant motion, and a hearing on the request for a preliminary injunction was held by Judge Singal on February 6, 2006, Docket No. 21, I do not address those portions of the instant motion seeking that injunctive relief or a "remedial order" or the responses of the other defendants.

The temporary restraining order at issue provides, in relevant part, that:

---

[1] The plaintiff does not specify the sanctions sought beyond a request that the court order certain specific relief, including ordering "the School Defendants to pay Plaintiff[']s legal fees incurred in preparing and [sic] [.]" Motion at 2; Memorandum of Law Supporting Plaintiff's Motion for Contempt, Remedial Order, Injunctive Relief and Sanctions ("Memorandum") (attached to Motion) at 25. A quotation in the Memorandum appears to tie the request for sanctions to the motion for contempt. Memorandum at 25-26. To the extent that other elements of the "remedy" requested in the Memorandum, *id*. at 25, seek relief other than sanctions, such relief is not appropriate as a result of the alleged contempt, which could only be the School Defendants' violation of the temporary restraining order, as discussed *infra*. The request for attorney fees, while it may well be properly presented in connection with the motion for contempt, is so indefinite and uninformative, and therefore lacking in development, that it does not merit further consideration.

2

> 1. T.N. shall be allowed to return to her regular classes at Massabesic Middle School beginning Tuesday, January 31, 2006.  She shall not be isolated from her classmates or in any manner placed in an alternative program.
>
> 2. T.N. shall not be expelled or suspended unless a due process hearing is held.
>
> 3. Should a hearing be held, the following minimum requirements must be met in order to supply T.N. the due process to which she is entitled in accordance with *Carey on behalf of Carey v. Me. Sch. Admin. Dist. #17*, 754 F. Supp. 906, 919 (D. Me. 1990):
>
>     a.   T.N. must be advised of the charges against her;
>     b.   T.N. must be informed of the nature of the evidence against her;
>     c.   T.N. must be given an opportunity to be heard in her own defense;
>     d.   T.N. must not be punished except on the basis of substantial evidence;
>     e.   T.N. student [sic] must be permitted the assistance of a lawyer;
>     f.   T.N. must be permitted to confront and to cross-examine the witnesses against her; and
>     g.   T.N.'s hearing shall be conducted before an impartial tribunal.
>
> 4. Should an expulsion or suspension hearing be held, T.N.'s right to be informed of the nature of the evidence against her includes a right to a copy of all of the evidence to be used against her.  T.N. must receive these materials by noon on Tuesday, January 31, 2006, in order to give her and her counsel adequate time to review them.
>
> 5. Should an expulsion or suspension hearing be held, the impartial tribunal must record or make a full transcript of the proceedings.
>
> 6. The impartial tribunal must issue a written explanation of its decision, including the findings of fact on which the decision is based.

Amended Temporary Restraining Order (Docket No. 12) at 3-4.

The MSAD 57 school board, the members of which are named as individual defendants in this action, held a hearing for over six hours on February 2, 2006.  Transcript, School Board Hearing M.S.A.D. #57, Central Office, Waterboro, Maine, February 2, 2006 ("Transcript") (Attachment 1 to Docket No. 27).  T.N. was represented by two lawyers at this hearing.  *Id*. at cover.  A full transcript was made.  *Id*.  The school board issued a written explanation of its decision, referring to the findings

of fact made by the board in executive session. Letter dated February 6, 2006 from Denise Allaire to Patricia LaBrecque (Exh. A to Second Affidavit of Mark Fisher (Docket No. 45)); Transcript at 157-66. There can be no question that a due process hearing was held. Transcript. There is no dispute that T.N. was returned to her regular classes beginning on January 31, 2006 and that for the three school days between that return and the due process hearing she was not isolated from her classmates or in any manner placed in an alternative program.[2] Second Supplemental Affidavit of Patricia LaBrecque (Docket No. 31) ¶ 16. I do not read the plaintiff's motion or memorandum to argue that T.N. was not given an opportunity to be heard in her own defense at the hearing. Accordingly, the motion for contempt cannot be based on any alleged violation of paragraphs 1-2; 3(c) & (e); or 5-6 of the court's Amended Temporary Restraining Order, and I will not consider those provisions further.

The First Circuit notes that "[t]he contempt power is . . . one of the most potent weapons in the judicial armamentarium." *Project B.A.S.I.C. v. Kemp*, 947 F.2d 11, 16 (1st Cir. 1991). As a result,

> [f]or one thing, in levying contempt sanctions, the court must exercise the least possible power suitable to achieve the end proposed. Second, a complainant must prove civil contempt by clear and convincing evidence. For another thing, civil contempt will lie only if the putative contemnor has violated an order that is clear and unambiguous. Related to this last requirement is the principle that any ambiguities or uncertainties in such a court order must be read in a light favorable to the person charged with contempt.

*Id*. (citations and internal punctuation omitted). With these standards in mind, I turn to the plaintiff's allegations that the School Defendants violated certain provisions of the temporary restraining order.

---

[2] Counsel for the plaintiff devotes considerable time and effort to a contention that the "reintegration" plan adopted by the school board to be followed after T. N.'s return from the suspension imposed by the board violated the requirement of the first paragraph of the conditions imposed by the court's temporary restraining order that T.N. "not be isolated from her classmates or in any manner placed in an alternative program." Memorandum at 3-5. It is clear from the context in which that requirement appears in the temporary restraining order that it applies only to T.N.'s return to classes before any due process hearing was held.

### Paragraph 3(a): T.N. must be advised of the charges against her

The plaintiff contends that "[t]he School Defendants . . . violated the Court's order that T.N. 'be advised of the charges against her . . .,'" apparently by denying her "an opportunity to see (or hear)" the alleged "coerced confession" and "the Sheriffs' [sic] 45 minute interrogation of her." Memorandum at 8. The fact that the deputy sheriff who questioned T. N. at the school shortly after she reported seeing the bomb threat was not at the hearing has nothing to do with the question whether T.N. was advised of the charges against her by the School Defendants. The charge that was considered at the hearing was the following:

> On or about November 2, 2005 T. N. wrote a bomb threat on the wall in the girls' bathroom at Massabesic Junior High School and reported it to a school staff member without disclosing that she had written it. The bomb threat resulted in the evacuation of the school building and considerable disruption to the school, its students[] and staff. T. N. later admitted to writing the threat both in interviews with the police and at a separate meeting with school administrators.

Transcript at 21-22. The hearing officer read that charge from a letter dated January 23, 2006 from Superintendent Lynda W. Green to the plaintiff, a letter which she admitted receiving. *Id*. at 20-21; Encl. 1 to Exh. 8 to Supplemental Affidavit of Patricia LaBrecque ("Plaintiff's Aff.") (Docket No. 20). Under these circumstances, the plaintiff cannot reasonably contend that T. N. was not advised of the charge against her in advance of the hearing.

### Paragraph 3(b): T. N. must be informed of the nature of the evidence against her and Paragraph 4: T.N.'s right to be informed of the nature of the evidence against her includes a right to a copy of all of the evidence to be used against her

The plaintiff asserts that these provision of the temporary restraining order were violated, but does not say how. Memorandum at 8. Apparently she means to argue that the absence of the tape recording of the alleged "coerced confession" and the mention of "the Sheriffs' [sic] statements to Defendant Superintendent Green and Defendant Principal Fisher" during the hearing demonstrate a

violation of Paragraph 3(b). They do not. From all that appears in the record, this provision was met by a letter dated January 31, 2006 from Melissa A. Hewey to Robert M. A. Nadeau and its enclosures. Exh. 8 to Plaintiff's Aff. With respect to Paragraph 4, the plaintiff argues that T.N.'s alleged confession to the deputy sheriff who questioned her after she reported the writing in the bathroom was "the heart of the charges against T.N." Memorandum at 8. However, the finding of fact adopted by the school board, Transcript at 157-62, does not mention the alleged confession to the deputy sheriff, and the board was repeatedly admonished by the hearing officer that testimony concerning the alleged confession was not to be considered by members of the school board as evidence that T. N. did in fact confess to writing the threat, but rather only as background to explain the actions taken by school officials, *id*. at 37-38, 137-38, 141, 153.

Since the transcript of the hearing demonstrates that all but possibly one of the members of the school board did not rely on the alleged confession to the deputy sheriff, the fact that the tape recording of that interview was not made available to the plaintiff does not demonstrate any violation of Paragraph 4 of the temporary restraining order, if that is the argument that the plaintiff intends to make. Memorandum at 8-9. I do note in this regard that the School Defendants had asked that the deputy sheriff or sheriffs involved be present at the hearing and they refused, Transcript at 34, and that the school board had no subpoena or other power to require their presence or the production of the tape recording. The School Defendants cannot be charged with contempt of this court's order for events over which they had no control.

### Paragraph 3(f): T.N. must be permitted to confront and to cross-examine the witnesses against her

The plaintiff again refers to the absence of the tape recording of the alleged "coerced confession" and the evidence of the "Sheriffs' [sic] statements" that was presented during the hearing as providing the only basis for her assertion that this provision of the temporary restraining order was

6

violated. Memorandum at 8. The school board did not rely on either to support its finding that T. N. wrote the bomb threat on the bathroom (or bathroom stall) wall. Accordingly, the absence of the tape recording did not deprive T. N. of the opportunity to confront and cross-examine witnesses.

### Paragraph 3(g): T.N.'s hearing shall be conducted before an impartial tribunal

The plaintiff devotes much of her written submission to the assertion that the members of the school board were not impartial with respect to the question whether T. N. wrote the bomb threat. Memorandum at 5-8. She also contends that the fact that the hearing officer had earlier represented the School Defendants in the instant case, along with his actions during the hearing, rendered the hearing "fundamentally unfair." *Id*. at 10. I will address the latter argument first.

### The Hearing Officer

The assertion that the lawyer who served as the non-voting hearing officer at the due process hearing "is representing the Board in this litigation," *id*. at 10, is not borne out by the docket in this case. The School Defendants also deny this assertion. Opposition at 2 n.3. To be sure, the hearing officer is a member of the same law firm as are the attorneys who do represent the School Defendants in this action, but that fact standing alone does not render the hearing unfair, nor does the fact that he provided legal advice to the board while serving as the hearing officer. *See, e.g., Gorman v. University of R. I.*, 837 F.2d 7, 15 (1st Cir. 1988):

> Nor do the various roles of Weisinger, while inappropriate in a judicial setting, necessarily violate the requirements of fairness. As Justice Blackmun noted in *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971), "the advocate-judge-multiple-hat suggestion . . . assumes too much and would bring down too many procedures designed, and working well . . . ." *Id*. at 410, 91 S.Ct. at 1432. Gorman's contention that Weisinger's various roles or "multiple-hats" are evidence of bias and undue influence, also "assumes too much." The University procedures are designed to give students an opportunity to respond and defend against the charges made, and there is no evidence which would show that Gorman was denied a fair hearing because of Weisinger's multiple roles.

7

Similarly, the evidence cited by the plaintiff in this case as demonstrating the hearing officer's purported bias does not in fact do so.

In this regard, the plaintiff first asserts that "Board Counsel interrupted witnesses if he thought their testimony m[a]y be damaging," citing only page 42 of the transcript. Memorandum at 10. Page 42 of the transcript does not record any interruption by the hearing officer. Transcript at 42. Next, the plaintiff states that the hearing officer "instructed the Board on the law," citing page 137 of the transcript. Memorandum at 10. That was precisely the reason for the hearing officer's presence at the hearing.³ Transcript at 4-5. There is nothing inherent in the giving of legal advice to the decision-maker that is evidence of bias or other unfairness. Citing page 84 of the transcript, the plaintiff next complains that the hearing officer "made evidentiary rulings." Memorandum at 10. That is not an accurate characterization of page 84 of the transcript. One of the attorneys representing the plaintiff at the hearing had objected repeatedly on the ground of hearsay. Lynda Green, the superintendent of schools for MSAD 57, had begun to testify. After counsel for the plaintiff interposed an objection based on hearsay, Green asked the hearing officer to define hearsay. Transcript at 83. He did so, indicated that the testimony to which an objection had been interposed went to a "non-material issue[]" and directed Green to continue. *Id*. at 84. In any event, as the legal advisor to the board, the hearing officer would be expected to make evidentiary rulings. Counsel for the plaintiff made no objection when the hearing officer stated that he would be doing do. *Id*. at 20.

The plaintiff next states that the hearing officer "made evidentiary objections of his own." Memorandum at 10. At page 91 of the transcript, the only citation given by the plaintiff in support of this assertion, the hearing officer directs the witness, Green, to "[s]tay with this situation," when it is apparent that she is about to describe an incident in which T. N. was not involved. Transcript at 91.

---

³ The plaintiff refers to the hearing officer as "statutorily mandated" but does not identify the relevant statute. Memorandum at 10.

8

This is not an "evidentiary objection." It is merely an understandable attempt to move the hearing along by excluding obviously irrelevant testimony. The plaintiff goes on to cite as evidence of bias an allegation that the hearing officer "intervened as prosecutor to rephrase questions," citing page 71 of the transcript. Memorandum at 10. It is important to remember that "the courts have not and should not require that a fair hearing [in the public school setting] is one that necessarily must follow the traditional common law adversarial method." *Gorman*, 837 F.2d at 14. In context, Mark Fisher, the principal of Massabesic Middle School, who was presenting the school's case on the charge against T. N., was questioning Franklin C. Sherburne II, special education director, about the actions he had taken on the day when T.N. reported finding the bomb threat. Transcript at 67-71. Counsel for the plaintiff interposed his third objection based on hearsay in a span of eight questions, including questions to establish Sherburne's name and job. *Id*. The hearing officer then explained the concept of hearsay to Fisher, who is not a lawyer, and asked him to avoid it. *Id*. at 71. As soon as Fisher asked his next question, counsel for the plaintiff made the same objection. *Id*. The hearing officer then suggested a way to ask the question that would elicit the necessary information while avoiding the use of hearsay. *Id*. Given the tactics employed by counsel for the plaintiff throughout the six-hour hearing, the hearing officer's effort to move things along was admirable.[4] It did not demonstrate bias in any way. In no sense was he "interven[ing] as prosecutor."

The plaintiff next alleges that the hearing officer "rephrased and guided testimony," citing page 142 of the transcript. Memorandum at 10. No testimony is being given at page 142 of the transcript; at that page, the board members are deliberating. Transcript at 142. In fact, the transcript at this page demonstrates that the hearing officer very properly was engaged in a colloquy with a single board

---

[4] Indeed, the MSAD 57 guidelines for expulsion of students, on which the plaintiff later relies, Memorandum at 10-11, provide that the hearing officer "will state 'no irrelevant or repetitious evidence will be allowed and no debate between the parties will be allowed.'" Expulsion of Students ("Expulsion Policy") (Encl. 4 to Exh. 8 to Plaintiff's Aff.) at 2, section I(C).

9

member in order to ensure that her decision was based on evidence that was appropriate for consideration by the board. *Id*. The plaintiff's final personal volley against the hearing officer is the assertion that he "not only wrote the findings but introduced evidence for the Board to consider, which after the Board had largely discredited it still was turned into a finding," citing pages 145-47 and 155-56 of the transcript. Memorandum at 10. To the extent that this assertion is comprehensible, it is entirely appropriate for the hearing officer to reduce the board's findings to writing. At pages 145-47 the hearing officer is merely seeking to ensure that the board members have fully considered the evidence. Transcript at 145-47. At pages 155-56 he suggests wording for a finding of fact based on what the board members had been saying in their deliberations. *Id*. at 155-56. The board members could, and did, make changes in his proposed language, as he in fact invited them to do. *Id*. There is no evidence to support a conclusion that the hearing officer acted in a way that was "fundamentally unfair" to T. N. in the cited pages of the transcript. There is also nothing in those pages that would allow a reasonable reader to conclude that the hearing officer "introduced evidence for the Board to consider," let alone that the board "largely discredited" any such evidence.

Finally, in connection with the plaintiff's argument about the hearing officer, she asserts that "despite the school district's own unequivocal written policy for expulsion hearing[s] that provides 'witnesses will be sequestered in response to a request by either party,' Board counsel denied Plaintiffs' request for sequestration, allowing the two primary witnesses against T.N., Superintendent Green and Principal Fisher, to stay and listen to each other's testimony." Memorandum at 10-11. The MSAD 57 expulsion policy does provide that "[w]itnesses shall be sequestered in response to a request by either party." Expulsion Policy § I(B). In this case, Fisher was the designated representative of the administration who presented the school's evidence. *See id*. § II(C). When asked by the hearing officer whether he wanted sequestration of witnesses, counsel for the plaintiff

10

replied that he did. Transcript at 22-23. After all prospective witnesses other than parties had left the hearing room, counsel for the plaintiff asked that Green be ordered to leave as well. *Id*. at 24-25. The hearing officer held that Green could stay in the room as the representative of a party. *Id*. at 25. After some ill-advised comments by counsel for the plaintiff, the hearing officer told Fisher that Green could stay in the room only if he called her as his first witness, which Fisher agreed to do. *Id*., at 25-26. He also stated that "[i]t's appropriate for the Superintendent of Schools to stay during the entire course of the hearing because at the conclusion of this she is going to be making a recommendation to the board and she has to hear the evidence in order to do that." *Id*. at 26. The plaintiff had made no attempt to show any prejudice that arose from this decision.[5] Nothing in this sequence of events indicates any bias toward T. N.

In this regard, it should be noted that with respect to disciplinary hearings in educational institutions "a major purpose of the administrative process and hearing is to avoid formalistic and adversarial procedures." *Gomes v. University of Me. Sys.*, 365 F.Supp.2d 6, 16 (D. Me. 2005). "[O]n judicial review the question presented is whether, in the particular case, the individual has had an opportunity to answer, explain, and defend, and not whether the hearing mirrored a common law criminal trial." *Id*. at 17 (quoting *Gorman*, 837 F.2d at 14).

> [T]he courts ought not to extol form over substance, and impose on educational institutions all the procedural requirements of a common law criminal trial. The question presented is not whether the hearing was ideal, or whether its procedure could have been better. In all cases the inquiry is whether, under the particular circumstances presented, the hearing was fair, and accorded the individual the essential elements of due process. In the words of Justice White, "the Due Process Clause requires, not an 'elaborate hearing' before a neutral party, but simply 'an informal give-and-take between student and disciplinarian' which gives the student 'an opportunity to explain his version of the facts.'"

---

[5] Indeed, the hearing officer's ruling is consistent with Fed. R. Evid. 615, which, although not directly applicable here, contemplates of necessity a number of exceptions to a general right to witness sequestration.

11

*Gorman*, 837 F.2d at 16 (citations omitted). Here, the plaintiff's argument is based almost exclusively on the position that the due process hearing was not sufficiently like a criminal trial. That is not what the law requires.

### The School Board

The plaintiff contends that all fifteen members of the MSAD 57 school board were so biased against her that they were unable to provide her with due process as a matter of law, because she had named them individually as defendants in this action. Memorandum at 5-7. She contends that only the delegation by the board of its fact-finding authority to "a completely independent and impartial fact-finder" would have comported with due process. *Id*. at 5, 8. This global argument exalts form over substance. State law vests the authority to consider student expulsion solely with the local school board. 20-A M.R.S.A. § 1001(9). The First Circuit rejected a similar argument in *Beattie v. Roberts*, 436 F.2d 747, 751 (1st Cir. 1971), *rev'd on other grounds Raper v. Lucey*, 488 F.2d 748, 751 n.3 (1st Cir. 1973), (not appropriate to require a body of neutral outsiders to review decisions that are properly the responsibility of the school committee; to do so would be to engraft into educational administration a layer of enormous complexity "and might well exceed the boundaries of our judicial authority and trespass into legislative territory"). The hearing officer asked all of the board members whether the filing of this action and his or her individual reactions to it would prevent him or her from deciding the case fairly and in accordance with his instruction to disregard the lawsuit. Transcript at 10-12. None of the members indicated that it would. In the absence of specific evidence of bias on the part of specific board members, the plaintiff has not demonstrated violation of the temporary restraining order on this basis.[6]

---

[6] The plaintiff also contends that Superintendent Green "repeatedly threatened that the Board was determined to expel T.N., if she did not confess." Memorandum at 6. Aside from the fact that this allegation greatly overstates the import of what the superintendent has actually been shown to have said, she had no vote in the board's decision and her alleged "bias" is thus irrelevant to any discussion of
(*continued on next page*)

The plaintiff does provide some evidence of alleged bias on the part of five of the fifteen board members. Memorandum at 6-8. The vote in favor of the finding that T. N. had in fact written the bomb threat was 14-1, Transcript at 162-64, so the alleged bias of these five members could not have affected the outcome. Even if that were not the case, the evidence of bias offered by the plaintiff falls far short of the clear and convincing standard applicable to motions for contempt. The first instance cited by the plaintiff, Memorandum at 6, is the statement of defendant Nancy Harrison during deliberations that "nothing has been presented to me tonight to change my opinion that [Fisher and Green] are grounded in their motion that we go forward with the expulsion," Transcript at 142. According to the plaintiff, this statement proves that Harrison "had adjudged T.N. guilty long before the hearing." Memorandum at 6. However, after Harrison made the quoted statement she said in response to the question "What's your opinion based on?" posed by the hearing officer, that the opinion to which she referred was "based on the statements from Mr. Fisher and Ms. Green" during the hearing. Transcript at 142. Considered in context, this statement provides no evidence of pre-hearing bias at all. The plaintiff also cites Harrison's statements that she was "confident that the procedures practiced by the administration of this district were consistent and fair" on the day of the discovery of the bomb threat and that she "give[s] respect to the statements made by Mr. Fisher and Ms. Green,"[7] *id*. at 141-42, as evidence of bias. Neither statement may reasonably be interpreted as evidence of bias, let alone clear and convincing evidence. As a member of the school board, Harrison was required to determine whether she found Green and Fisher to be credible witnesses.

The plaintiff next asserts that "[t]he Board was so convinced of T.N.'s guilt that they would not even meet with her unless she confessed and apologized," citing her own affidavit. Memorandum at 6.

---

the impartiality of the tribunal before which the hearing was conducted. Similarly, the allegedly biased statement to the press by counsel of record in this action, *id*., is not evidence that the school board was not impartial at the hearing.

[7] The plaintiff erroneously attributes the latter statement to defendant Priscilla Ouellette. Memorandum at 8.

That paragraph of the affidavit recites only the statements of Green and cannot reasonably be read to state that the members of the school board had refused to meet with T.N. unless she confessed. Second Supplemental Affidavit of Patricia LaBrecque [Corrected] ¶ 13. Even if it could be so construed, it is the impartiality of the board at the time of the hearing, not what the state of mind of its members was two months earlier, that determines whether the members of the board violated the temporary restraining order.

The plaintiff's next specific reference is to "a Board member who was reported to say before the Court's Order that T.N. was going to be expelled" and the hearing officer's asking this member whether he wanted to confer with the hearing officer. Memorandum at 7. The "report" at issue was the statement of counsel for the plaintiff that he was "informed" that defendant Dominic Vermette "has said to his nephew, Tom Knight, that T.N. will be expelled." Transcript at 17. The hearing officer, after asking Vermette whether he wanted to confer with the hearing officer, *id.*, subsequently stated that he would not confer separately with Vermette and asked him directly whether he could not judge the issue impartially and "base it solely on the evidence you hear tonight," *id.* at 19. Vermette responded that he did not "have any reason to remove [himself]." *Id*. In the absence of evidence that Vermette actually did say anything of the sort to his nephew, the actual words he spoke and the circumstances under which he spoke, and in the presence of Vermette's affirmative response, no bias on the part of this defendant has been shown by clear and convincing evidence.

The plaintiff goes on to attack defendant Ouellette, Memorandum at 8, citing as evidence of bias her statement during deliberations that

> I have a summons that I have to trust that the sheriff's office would not have presented had they not had something that looked like evidentiary [sic] that they could present when they go to court. I have to trust that. . . . [I]t's proof that some sheriff, some young man in a brown uniform, thought that maybe he had something to go on. So if I'm tipping the scales for preponderance, I've got to give that some credibility.

14

*Id*. at 153. The hearing officer told Ouellette to disregard the summons that had been offered into evidence by counsel for the plaintiff. *Id*. at 50-51, 153. The instruction to disregard the summons issued to T. N. may well have gone too far. Not only was the summons offered by the plaintiff as evidence, but the fact that it was issued is not the equivalent of testimony that T. N. had confessed. Thus, Ouellette's explanation of the weight she gave to the document may well serve to demonstrate a proper consideration. Even if Ouellette's rejection of the hearing officer's direction to disregard the summons was erroneous, it cannot serve as clear and convincing evidence of bias on her part.

Finally, the plaintiff cites, Memorandum at 8, the following statement by defendant Mary Ross as evidence of impermissible bias: "I guess we have to have trust in our administrators that they followed procedure, due procedure, and that the sheriffs followed due procedure on what they were supposed to do," Transcript at 151. In the absence of any evidence to the contrary about the administrators, this statement as to them cannot be evidence of bias against T. N. The remark with respect to the sheriffs is akin to that made by Ouellette and quoted above, and my treatment of it is the same. It is noteworthy that almost immediately following Ross's remark, defendant Ross says, "It's hearsay;" defendant Lee Steele says, "We don't have that information;" and defendant Brenda LaFrance says, "We can't use the sheriffs' testimony because we don't have it." *Id*. Far from demonstrating bias, the members of the board were trying to apply the law as the hearing officer had explained it to them. Again, there is no clear and convincing evidence of bias on the part of any of the members of the school board, which served as the tribunal at the due process hearing.

**Paragraph 3(d): T.N. must not be punished except on the basis of substantial evidence**

The plaintiff's final salvo is a fervent argument that the school board's conclusion that T.N. had written the bomb threat was not supported by substantial evidence. Memorandum at 11-13. She asserts that the use by the board and the hearing officer of the term "preponderance of the evidence" as

15

the standard of proof rather than "substantial evidence" is "uncontroverted" evidence "that the wrong legal standard was applied by the Board in violation of the Court's Order." *Id*. at 11. She cites no authority in support of this assertion.

The hearing officer told the members of the board that the term "preponderance of the evidence" means "whether it's more likely than not that T. N. did in fact make a bomb threat." Transcript at 137. Later, when asked for a definition, the hearing officer replied, "The simple way to say it is is the evidence sufficient for you, acting as a reasonable person and acting as you would in a serious matter in your own life, to conclude that it's more likely than not that she made the threat. You should be satisfied in your own mind . . . that she did make the threat. If you are not, then you don't have a preponderance of the evidence." *Id*. at 143. The hearing officer reminded the members of the board that "[t]he burden is on the administration to establish, by a preponderance of the evidence." *Id*. at 152. This definition of the concept of preponderance of the evidence is correct. *See, e.g., Goudy & Stevens, Inc. v. Cable Marine, Inc.*, 924 F.2d 16, 20-21 (1st Cir. 1991). It is the standard of proof required by the MSAD 57 policy on expulsion of students. Expulsion Policy, §II(O).

As the First Circuit has repeatedly stated,

> [s]ubstantial evidence does not mean a large or considerable amount of evidence, but rather such evidence as a reasonable mind might accept as adequate to support a conclusion.

*ATC Realty, LLC v. Town of Kingston*, 303 F.3d 91, 94 (1st Cir. 2002) (citation and internal quotation marks omitted). "Substantial evidence requires more than a scintilla but less than a preponderance." *Id*. at 95 (citation and internal punctuation omitted). "While 'substantial evidence' is 'more than a scintilla,' it certainly does not approach the preponderance-of-the-evidence standard normally found in civil cases." *Bath Iron Works Corp. v. U. S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003). *See also Vieques Air Link, Inc. v. U. S. Dep't of Labor,* 437 F.3d 102, 104 (1st Cir. 2006) (same). Thus,

16

in the case at hand, the defendant school board members applied a standard of proof in excess of that required by the temporary restraining order. It may well have been, in a technical sense, the "wrong" standard, as the plaintiff asserts, but the only error was in her favor. There is no basis for a finding of contempt in the defendants' choice of standard of proof.

The plaintiff also recites the evidence before the board and pronounces it not to be substantial. Memorandum at 11. She does not explain why or how that evidence fails to meet the "substantial evidence" standard. After reviewing the evidence presented in the hearing, I conclude that there was easily "more than a scintilla" of evidence that T. N. wrote the bomb threat. That evidence included T. N.'s colloquy with Green, when T.N. responded "yes" when asked if she understood the consequences of what she had done and "I don't know" when asked why she had done it, Transcript at 86; the fact that the threat was written in a location that was not obvious, *id*. at 31; that it was reported by T.N., *id*. at 60-61; and the fact that T. N. never denied writing the threat, *id*. at 144-50, 157-58. This was sufficient to meet the standard for imposition of discipline imposed by the temporary restraining order.

Further, after a careful review of all of the evidence in the record I can only conclude that the evidence properly considered by the school board also met the preponderance-of-the-evidence standard. The plaintiff has not shown that anything in the actions of the School Defendants in connection with the due process hearing entitles her to any of the relief that she seeks.

### Conclusion

For the foregoing reasons, I recommend that the plaintiff's motion for contempt and for any sanctions or remedial order associated with the motion for contempt be **DENIED.** I also recommend that the request for a new temporary restraining order against the School Defendants be **DENIED** because the plaintiff has failed to demonstrate the likelihood of success on the merits that is essential to such relief. *See Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004). I do not address the

plaintiff's pending requests for preliminary injunctive relief and for any remedial order or sanctions associated therewith.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 22nd day of March, 2006.

                                            /s/ David M. Cohen
                                            David M. Cohen
                                            United States Magistrate Judge